Will you refuse to receive it? I think we have a wide leeway to do that. I'd like to move the admission of my law clerk, Jennifer Robinson. Jennifer, I think you're supposed to stand. She's a lawyer in good standing in the state of California and has served me and the entire court extremely well. I'll miss her, as we often do with our law clerks, but at least she'll be a member of our bar if you accept my motion. I need to consult with my colleague. You need a majority, Judge Flanagan. Well, this is not an easy thing to decide. We normally don't deliberate in public either. I think you have my vote. I'll grant the motion, Chief. Please raise your right hand. Do you swear or affirm that you comport yourself  uprightly and according to law, and that you will support the Constitution of the United States of America? I do. Congratulations, and welcome to the bar of the United States Court of Appeals. Congratulations, Jennifer, and welcome to the bar of the court. Thank you. And our first case this morning will be Hartford Fire v. The United States. Mr. Van Arnum? Yes, I'm Frederick Van Arnum for the appellant Hartford Fire Insurance Corporation. The key question before the court today is whether a reasonably diligent plaintiff possessing the information that Hartford knew prior to the expiration of the protest period, what we refer to as the HUBI entries, would expect to discover facts constituting claims in a totally unrelated matter, which we refer to as the HUBI entries. We respectfully state that the answer to that question is no. And as a result of that, jurisdiction in this case would lie under 28 U.S.C. 1581I and the rule of law announced by this court in the St. Paul Fire and Marine case. Let me ask you a slightly technical question, and it may not have a lot of bearing on this particular case, but I'm curious about it. Is the problem that the court didn't have jurisdiction or is under 12b1, or is the problem that you couldn't state a claim for which relief could be granted under 12b6? The statute seems to give the CIT jurisdiction without any conditions on it, I, the I provision, although we've imposed some restraints. And I'm wondering whether it's a jurisdictional problem or a failure to state a claim. Well, certainly the court below poses as a jurisdictional problem. They claim that the matter, the underlying matter, is simply Hartford contesting a charge. That charge is pursuant to the previous Hartford case, now must be protested pursuant to the protest mechanism. And then once you've denied protest, then avenue into the CIT would be under what we call the 1581A jurisdiction. However, our case is different in that what we have is the after-discovered claim situation, where our claims were discovered after the protest period had expired. Mr. Van Arnam, is that actually correct? I got the impression that the trial court was saying you had notice of the arrest of the Sunline personnel well before the period even started. And the trial court seemed to feel that you had some burden here to pursue that information. Well, I think the trial court had the benefit of hindsight. And they were able to look at this case and say, yes, Hartford, you did discover your claims. And had you done it earlier, you would have discovered them earlier. However, we have to change the vantage point here. The issue shouldn't be looking back. We need to put ourselves in the situation of Hartford. What did they know at this time? And did that give them reason to believe that if they were to get the Shen file and review the Shen file, that they would discover claims that they could raise relating to the Hubei entries? Same products from the same country. Same products. And it's kind of a unique product. I mean, tail meat is not a very common product. I don't know how common or not it is, Your Honor. But the fact remains that once we reviewed the Shen file, what did we determine by doing that? Well, we determined that Hartford had no financial stake in any of the transactions underlying the Shen matter. We hadn't bonded any of those cases, any of those entries. At that point in time, I would respectfully submit that a reasonable surety would simply close the file on it, realizing that they didn't have a stake in the Shen matter. The trial judge triggered May 6 as the trigger date for you. And that was the date that your outside counsel heard about this indictment. It's unclear from the record whether the communication was at a bar or just exactly what the circumstances were. Let's assume hypothetically that that's not enough to trigger, because it was a totally unrelated transaction. It's true it was the same organization, the Sun Line. But there was no particular reason for Hartford to be tracking everything that that company did. That would be a little, perhaps, excessive. But anyway, assuming that's not enough, let's assume, however, that on June 22, that's when customs made its demand. At that point, Hartford is certainly on notice that they have to pay, right? And it wasn't until October of that same year that Hartford got around to exploring the Shen case, which they'd already heard about, but maybe having heard about it wasn't enough. But by this time, they now know there's a protest coming. Why isn't that enough? Well, Your Honor, again, I think you have to really appreciate what Hartford knew on June 22. The May 6 event, this telephone conversation between the outside counsel and this unrelated customs broker, consisted of the customs broker telling the outside counsel that the customs broker had heard that two employees of Sun Line Business Corporations had been arrested for filing false invoices relating to customs entries. That was a sum total of what was communicated to Mr. Shapiro. Nowhere in that communication was there anything told to him that would imply that the transactions in the Shen case implicated entries that Hartford had bonded. Clearly, back in May of 2005, there had been no demand made on the Hubei entry. So clearly, at that point in time, there is absolutely no nexus between that communication and what eventually occurred. Without any nexus, why do you get the Shen file later? Do you get some additional information that motivates you to undertake your study? Well, Your Honor, I'm not sure why they proceeded to get the Shen file. Perhaps it was due to a duty. If there was something that motivated you to get it later, the trial court would be saying, why didn't that motivation come at an earlier point? But again, there's nothing on the record going into that motivation as to why they went to get the file, other than the fact that they had heard about it. And the reason they were getting the file was not simply to look through the file to see if they could discover facts establishing claims that they were going to make in the Hubei entry relating to this material misrepresentation and the release of collateral. What they were going was checking the file to see if, in fact, they had a business stake in the underlying transactions in the Shen case. Having determined that they didn't, I would say, at that point in time, their duty to inquire further would have ended. Is there a difference between the duty to inquire and due diligence in these cases? Is that the same thing? Well, again, I think the duty to inquire is triggered when facts exist which suggest to the reasonable plaintiff that they need to investigate. Where does the duty to inquire appear? I don't find any of our cases that talk about a duty to inquire that I know of. Maybe you, maybe government can help with that. The cases as I've seen them all talk about exercising due diligence. And the question I have is, is there a difference between those two ideas? Well, I think for purposes of when the statute of limitations would approve, that would happen in one or two situations. A, the plaintiff actually received notice that it has a claim. Or B, a reasonably diligent plaintiff would have discovered the facts that constitute its claim. So in- Now, back on that reasonably diligent point, May 6th you hear of the arrests of the Sunline personnel. You don't request the file until mid-October. That's correct. Why the months of difference there? Well, let's first look at what happened. In May 6th, there had been no demand made against Hartford for the Hubeye entries. There was no reason for Hartford at that point in time to say, well, we just heard about this. Let's go find out if the Hubeye entries are implicated. No demand had been made. There was no protestable event. It happens a month later. It happens seven weeks later. Yes. June 22nd. Yes. And so then thereafter- Why then is it October 7th when you finally get around to saying, let's look into this Sunline case? But still, even on June 2nd, there was nothing there to tie the Hubeye entries into what was going on in Sunline. Remember, Sunline involved a criminal matter involving two individuals who didn't have a business relationship with Hartford. Judge Plager, you mentioned earlier that this involved Sunline. Well, these are employees of Sunline. Sunline was not involved in the Shen matter. Sunline is the- It was never indicted. The company was never indicted. It was never indicted, no. But Hartford's relationship was not with the individuals. It was with Sunline. They are the principal obligor. Well, the period for protest expires in September. Yes. I'm still confused as to why you even undertake the investigation weeks later. Well, simply so they could learn to see if there was any business activity that they had bonded involved in the Shen matter, not just the Hubeye entries. Hartford bonds, lots of- Why wouldn't they have done that before their protest period expired? Because at that point in time, they didn't realize that they had a claim to protest. Remember, the claim that they discovered are these two nuggets that are buried deep in this file, totally unrelated to the Hubeye entries. There's nothing in that letter in the agent's report which mentions the Hubeye entries or mentions Hartford. There's nothing in that release of collateral which mentions the Hubeye entries or Hartford. I mean, they found a needle in a haystack. Now, Your Honor, I see where I'm into rebuttal. But your outside counsel made a FOIA request regarding the Sunline entries before the customs demand was filed on June 22. May I clarify that? He made a FOIA request for some other entries that Hartford had bonded for Sunline. And the response to that FOIA gave Hartford no reason to pause to think that there was some larger issue that would have impacted Hartford's relationship with Sunline and whether the government had acted unreasonably in allowing those bonds to be executed. The FOIA request was not related to the Hubeye entry. The Hubeye entry FOIA request, no. These involved different entries. I see I'm into my rebuttal time. Would you like to save that time? I would, Your Honor. OK. Thank you, Mr. Van Arnam. Ms. Burke. May it please the court, the trial court's judgment should be affirmed. Hartford should have known of the existence of its potential claim as early as May, which is before even the protest period began. No, wait a minute. No, wait a minute. Hartford's a big company. It's got a lot of things going on. Somebody says something at a party about an investigation that's unrelated to any of their business on this particular set of entries. Is it the government's position that the lawyers have an obligation or the company has an obligation to constantly keep track of every entry that they provide surety coverage for? No, but that's the facts as the court has just stated them are actually more complex or complicated than just that skeletal first conversation. And this is what happened. Hartford hears in May of the charging of two individuals from Sunline. It wasn't even a Hartford lawyer. It was an outside counsel, right? Right. Well, right. So it wasn't a Hartford employee. Correct, but it was somebody who was in touch with Hartford. Who had been hired by Hartford from time to time to do other business. Correct, but then two very important things happen right after that. Hartford makes a FOIA request regarding other Sunline entries and it doesn't. Again, using outside counsel. Correct, and it doesn't pay the demand. OK, and at that point, you have a legitimate complaint, don't you? That they ought to start thinking, but that's not May 2005. Well, Hartford makes the FOIA request according to the affidavit before Customs makes its demand. And then between the 90 days. Two weeks before. Right, and then we're only dealing with, I think, about a month anyway. Then you have a 90 day period of time during which Hartford decides not to pay the demand. So obviously Hartford thinks that there's something wrong with. Why would we think that? I'm a little bit puzzled as to what would really drive Hartford to investigate here at all. The only real connection is that the Sunline personnel are dealing with the same tail meat imports that Hartford's dealing with. But tail meat imports from China, it's a big country, it's different importers. What would cause them to realize there's a connection? Well, what Hartford learns in May is not just that there is general fraud in the importation of tail meat from crawfish, tail meat from China. It's that there's fraud on the part of Sunline who Hartford insures. So it's the very same subject merchandise and the same party, the same financial relationship between Hartford and the defendant. But it's not the same party. Well, it's not the same party because I think as Hartford mentions a couple of times, it wasn't Sunline that was the defendant. And I don't want to get too far into information that's not on the record. But as far as I know, Sunline is these two officers, as often happens with importers. It's really just a couple of people who organize to. But why would they be required, as the court seems to require them, to undertake an investigation when there's nothing that links this arrest to their imports? Well, they're not required to do anything. I think the question is whether somebody in their position should have exercised due diligence to learn more if they want to make a challenge. Is there a difference between exercising due diligence and a duty to inquire? Well, I was frantically trying to figure out whether I had any explanation on that. And I think where the language comes from, at least insofar as we used it and maybe the trial court used it, is from the Pomeroy case. And the Pomeroy case, of course, is from the District of New York. And I was just checking that they talk about inquiry notice, citing a couple of Second Circuit cases. To me, I think they're in somewhat different statutory frameworks. Right. And I think the concepts are used interchangeably. I'm not sure that they're different. OK. Let me ask you this question. Assuming for the moment, well, let's move on for the moment. The customs demand was June 22, 2005. And Hartford didn't file their lawsuit until two years later, 2007, right? Right. Is there no latches problem involved here? Well, if Hartford is correct that its claim did not accrue until after the protest period expired, and obviously we don't agree with that. But if they are correct, then I think we have to concede that this case would fall under the trial court's jurisdiction under 1581I, in which case they would have two years to bring their claim. They did bring it within two years. So I don't think that we have a latches argument in this situation. Is there a statutory limit under 1581I? 1580I? 1581I uses the two-year APA statutory limitation, yes. And I think they're within the two years. I couldn't be utilized if A should have been. That's correct. That's correct. And so it's a little bit of a confusing mix of statutes of limitations, the way that A and I work together. But I think in this instance, we would have to concede that I jurisdiction could have been used. Again, I don't want to get too far into the merits, because we don't know that much about them, and they've never been briefed. The reason your Honor asked the question earlier about why this couldn't be viewed as a 12B5 matter. Yeah, 12B6. Right. For some reason, the Court of International Trade insists on calling it 12B5, which confuses everybody. We'll use your code. I think that, and this gets into the unusual interplay between A and I, as long as we use this court's decision in St. Paul's Fire, and read in conjunction with Hartford, I think we have to concede that there's at least a claim stated under I for this kind of a situation. That's what I think, too. I think they stated a claim, but I think, if anything, they have failed to state facts on which relief can be granted. Well, that's a possibility, and it's not something that we raise to the trial court. And I think if it ever got to the merits, we would certainly make the argument that Customs wouldn't have had any obligation to notify Hartford of any kind of knowledge that it may have had. The court has no further questions. For these reasons and the reasons stated in our brief, we respectfully request that the court affirm the trial court's judgment. Thank you. Thank you, Ms. Burke. Mr. Ben-Arnim, you have nearly four minutes remaining. I have to clarify something that Ms. Burke said. I believe she said that in May of 2005, when Hartford learned that these individuals who work for Sunline had been arrested, that also that Sunline, that Hartford had discovered fraud on behalf of Sunline. That's just not the case. That didn't occur. And back again in May of 2005, all that was communicated to Hartford's attorney was the information that two individuals had been arrested for using false invoices. And again, back then, there had been no demand made on the Hubei entries. There'd be no reason at that point in time to say, gosh, we've got to go investigate this because of the Hubei entries. Now, the second thing, when she talks about the FOIA request, again, just to clarify, Hartford did issue other bonds to Sunline, and the FOIA request was done in the context of learning about the documentation for three other entries. Hartford has to get a hold of the entry paper so it can determine whether or not they have any valid defenses or claims. The FOIA request that came back for these three unrelated entries, again, gave Hartford no reason to believe that there was any wrongdoing by the government prior to when the Hubei entries, the Hubei bonds were executed. So in light of all this, I think that the record before the court establishes that when you look at what a reasonably diligent plaintiff would have done, knowing what Hartford knew prior to the expiration of the protest period, that with those facts, there would be no reason for it to believe that if it ran out and reviewed the Shen file, it would discover these facts supporting claims for material misrepresentation and release of collateral based on a simple knowledge that two individuals for Shen had been arrested. And your honors, if you have no further questions, I am complete. Thank you, Mr. Van Arnam.